# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# ALEXANDRIA DIVISION

---

| | |
|---|---|
| JAMES R. COX, ET AL. | CIVIL ACTION NO. 03-0988-A |
| -vs- | JUDGE DRELL |
| DAVID J. WIGHTMAN, ET AL. | MAGISTRATE JUDGE KIRK |

## R U L I N G

On May 27, 2003, James R. Cox and Laura Cox, along with their children Travis James Cox and Leigh Erin Cox (hereinafter collectively referred to as "Plaintiffs"), brought action in this Court against Defendants: David J. Wightman and Pam Elaine Wightman (the "Wightmans"); Louisiana Farm Bureau Casualty Insurance Company (hereinafter "Farm Bureau"); and Aulds, Horne, and White Investment Corporation (hereinafter "Aulds"). Following settlement between the parties and Defendants' motions for summary judgment, only Plaintiffs' claims against Aulds remain. Those claims center on an alleged breach of contract. After a bench trial and for the following reasons containing findings of fact and conclusions of law, this Court will render judgment in favor of defendant Aulds, and dismiss Plaintiffs' claims with prejudice.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.   Background

On August 15, 2002, Plaintiffs purchased a Pineville, La. residence from the Wightmans.  Plaintiffs entered into a mortgage contract with Aulds to finance the purchase.  To insure the home, Plaintiffs purchased two insurance policies from Farm Bureau:  a standard Homeowner's policy, and a Standard Flood Insurance Policy (SFIP) funded through the United States Congress' National Flood Insurance Program (NFIP).[1]

During Hurricane Lili's heavy rains of October 2002, water entered the lower level of the residence, and the storm's strong winds caused a power outage.  After the havoc subsided, Plaintiffs documented the damage caused by the flooding, and promptly notified Farm Bureau, who issued a check for these losses in the amount of $15,367.41, made payable to both Plaintiffs and Aulds.[2]

In late October of that year, in preparing to make an electrical system upgrade, Plaintiffs removed part of their basement wall.  There they discovered

---

[1] The SFIP is different from ordinary insurance policies in that all payments on the policy come directly out of the United States Treasury.  See Gowland v. Aetna, 143 F.3d 951, 955 (5th Cir. 1998).  The private insurance company, in this case Farm Bureau, acts as the fiscal agent of the United States, and earns a percentage commission for all payments made on the policy. Id. at 953. Thus, unlike the typical insurance situation, the private insurer has every incentive to compensate the insureds for each and every element of loss they have actually suffered.

[2] Farm Bureau has since issued a second check to Plaintiffs in the amount of $2,050 for roof damage to the residence.  (Plaintiffs' Exhibit 20).

2

several types of toxic mold growing.  Since then, repairs to the home have been postponed, and Plaintiffs have abandoned the residence.

On March 6, 2003, Plaintiffs' counsel sent a letter to Aulds requesting release of the proceeds from the flood insurance check for payment of further toxic mold testing.  (Plaintiff's Exhibit 9).  In response, Pamela Lowrie, an Aulds representative, sent a letter dated March 12, 2003, to Plaintiffs' counsel denying the request based on a provision contained within the mortgage contract. Plaintiffs have had no further contact with Aulds, and have since been placed in default on the mortgage.[3]

## II.    Plaintiffs' Claims

Plaintiffs seek rescission of the mortgage contract and damages based on Aulds' conduct.  Plaintiffs believe that, in refusing to release the flood insurance proceeds for mold testing, Aulds breached its reciprocal obligation to act responsibly with regard to repair of the mortgaged home, and failed to exercise the mortgage contract in good faith.  We disagree.

At the root of Plaintiffs' breach of contract claim is a fundamental dispute between the parties as to whether, under the terms of the mortgage contract, Aulds had an obligation to release the flood insurance proceeds for mold testing.

---

[3] According to his trial testimony, in January of 2003, prior to asking his counsel to contact Aulds by letter, Mr. Cox called Aulds and informed a representative named Ms. Stokes that toxic mold likely existed in their residence.  During that conversation, Mr. Cox initially inquired as to whether Aulds would consider releasing funds from Farm Bureau's flood insurance check to cover mold testing expenses. Cox further testified that, neither Ms. Stokes, nor anyone at Aulds, contacted him in response to his inquiry prior to receiving his counsel's letter.

Prior to resolving that issue, a brief review of Louisiana law regarding mortgages and the interpretation of contracts is necessary.

A mortgage is a non-possessory right created over property to secure the performance of an obligation.  La. Civ. Code art. 3278 (West 2007).  Like other contracts, the interpretation of a mortgage contract is governed by the common intent of the parties.  See La. Civ. Code art. 2045 (West 2007).  If the words of the contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent.[4]  See La. Civ. Code art. 2046 (West 2007).

Contracting parties are required to perform in good faith, which entails performance in accord with the contractual provisions that set forth the parties' mutual obligations.  Newman Marchive Ptshp., Inc. v. City of Shreveport, 944 So. 2d 703, 710 (La.App. 2 Cir. 2006).  Consequently, a breach of contract occurs if contractual discretion is exercised in bad faith.  Adams v. First Nat. Bank of Commerce, 644 So.2d 219, 222 (La.App. 4 Cir. 1994).  While bad faith typically involves actual or constructive fraud, a "neglect or refusal to fulfill some duty or contractual obligation" will support such a finding.  Id.

Here, Plaintiffs entered into a conventional mortgage with Aulds to secure financing for the purchase of the Pineville, La. residence.  Section 5 of that

---

[4] The words of a contract must be given their generally prevailing meaning.  La. Civ. Code art. 2047 (West 2007).

4

contract, entitled "Property Insurance," governs the disbursement of insurance proceeds, and states, in relevant part:  "Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration and repair of the Property, if the restoration and repair is economically feasible and Lender's security is not lessened." (Plaintiffs' Exhibit 2).  That section further provides that "[f]ees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower."  (Plaintiffs' Exhibit 2).

Plaintiffs' counsel's letter to Aulds, dated March 6, 2003, requested release of the flood insurance proceeds to "provide for further testing with regard to the extent of the toxic mold that has been located in their home."  (Plaintiffs' Exhibit 9).  Under Section 5 of the mortgage contract, however, insurance proceeds may be applied only to "restoration and repair" of the residence. "Testing" is simply not tantamount to "repair and restoration."  Aulds was not therefore contractually obligated to release the flood insurance proceeds to Plaintiffs for mold testing.  We recognize the probable need for such testing in this situation; however, we find the language in the mortgage contract on this issue clear and unambiguous, and consequently, under Louisiana law of obligations, dispositive of the parties' intent.

5

Moreover, the same Section 5 of the mortgage contract addresses the issue of the parties' financial responsibility with regard to fees for testing.  As noted above, the contract provides that "[f]ees for public adjusters, or other *third parties*, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower."  (emphasis added)(Plaintiffs' Exhibit 2). While the contract in question does not explicitly refer to expenses incurred for "testing," we find that, under the above contractual language, such expenses are of the type intended by the parties to be paid by Borrower and not to be deducted from insurance proceeds.  Though we are sympathetic to the health issues and financial burden sustained by Plaintiffs as a result of the toxic mold infestation, we hold that Defendant Aulds did not breach the mortgage contract by refusing to release the proceeds from the flood insurance check to Plaintiffs for mold testing.  Accordingly, Plaintiffs' claims for breach of contract and damages are hereby dismissed with prejudice.[5]

SIGNED on this 5th day of March, 2007, at Alexandria, Louisiana.

Dee D. Drell
United States District Judge

---

[5] Though outside of our ruling here, we note, without deciding, that, pursuant to the language contained within Section 5 of the mortgage contract, if, repairs or restoration to the residence were not economically feasible because of the mold discovery, the proceeds from the insurance checks issued by Farm Bureau – totaling $17,417.41 – should be applied toward the principal balance remaining, if any, on the mortgage note.  No evidence was presented on the economic feasibility issue and we were not called upon to determine the actual allocation of those insurance proceeds.